Laura Collins v. Commissioner.
Collins v. Commissioner
Docket No. 2766-67.
United States Tax Court
T.C. Memo 1970-91; 1970 Tax Ct. Memo LEXIS 270; 29 T.C.M. (CCH) 440; T.C.M. (RIA) 70091; April 22, 1970, Filed *270 Julian B. Wilkins 180 W. Washington St., Chicago, Ill., for the petitioner. Robert H. Burgess, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioner's income tax for the calendar year 1963 in the amount of $3,730.75. The only issue for decision is whether petitioner had unreported income in the amount of $12,729.55, composed of certain bank deposits and $10,000 which petitioner in 1963 had a Chicago bank exchange from smaller to larger denomination bills. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner is an individual who at the time of the filing of the petition in this case resided in Chicago, Illinois. Petitioner filed her individual Federal income tax return for the calendar year 1963 with the district director of internal revenue at Chicago, Illinois. During the calendar year 1963 petitioner owned and operated a restaurant known as the Bar-B-Que House which was located at 211 East Garfield Boulevard in Chicago, Illinois. During part of the year 1963 petitioner also lived at this address. Petitioner kept her books and filed her Federal *271 income tax return for the calendar year 1963 on the cash receipts and disbursements method of accounting. Petitioner opened the business known as the Bar-B-Que House in 1959. At the time she opened this business she employed a firm of accountants to keep her books and prepare any tax returns which she was required to file with the State of Illinois and the United States Government. Petitioner opened the Bar-B-Que House at 12 noon each day except Monday and closed at 3 or 4 a. m. the following day. The Bar-B-Que House was closed on Monday. During the year 1963 petitioner had a number of different employees working at the Bar-B-Que House but not more than three full-time and one part-time employees worked there during the same period of time. There were two shifts of employees. One shift worked from 12 noon to 8 p. m., and the other from 8 p. m. to 3 or 4 a. m. The primary work of the employees was to cook and serve the food, collect the price charged for the food served, and ring up the amount collected from each sale on the cash register under the proper designation. At the end of each shift each day, petitioner would close down the cash register, remove the tape, count the money, *272 and start a new tape for the other shift of employees. During the year 1963 petitioner kept a record of daily sales of her business to furnish the accountant who kept her books. She prepared this record from the daily cash register tapes. She made the entries on these books at the end of each week. The cash register contained the designations for chicken, ribs, rib tips, hot links, and miscellaneous, and the daily sales were recorded under these designations as well as in total. Each month petitioner gave these records of the daily receipts which she had kept to the certified public accountant who kept her books. From the total receipts as shown on the daily record kept by petitioner, the accountant would prepare petitioner's monthly Illinois Combined Retailers' Occupation Tax, Use Tax, Service Occupation Tax and Service Use Tax return. The first item to be placed on schedule A of this return was "Receipts from sales." 441 Several weeks after furnishing her sales records to the accountant petitioner disposed of the accumulated cash register receipts. Each month petitioner would furnish her accountant with her receipted bills and her business checkbook stubs in order that he might *273 compute and enter into the books he kept for her business operation the cost of goods sold, salaries, wages and other expenses which she had paid during the month. From the total monthly sales records which the accountant compiled from the daily records kept by petitioner and the books which he kept for petitioner's business, the accountant would prepare the profit from petitioner's business operation to include in her Federal income tax return. The accountant who kept petitioner's books and prepared her tax returns kept the records for three other Bar-B-Que sales businesses located in South Chicago. Petitioner's gross profit percentage, as her accountant computed it, was approximately the same as that of two of his other clients engaged in a similar business. The gross profit percentage of the other one of the accountant's clients engaged in the Bar-B-Que business was substantially less than petitioner's. During the calendar year 1963 and for some time prior thereto petitioner maintained a business checking account in the name of the Bar-B-Que House at the Chicago City Bank and Trust Company. Petitioner maintained a personal checking account during this year at the South East National *274 Bank and she maintained two savings accounts at the South East National Bank, one in her name and one in the name of her daughter, Linda Collins. When expenses of the Bar-B-Que House business were paid by check on the business bank account in the Chicago City Bank and Trust Company, the accountant who kept petitioner's books would enter by the amount of the payment, the number of the check with which the payment was made. Business expenses which were paid by cash or by checks drawn on petitioner's personal checking account would be entered on the books as cash payments. Petitioner made payments with checks on her personal account when the balance in her business account was low and for some reason she did not wish or was unable to make the payment in cash. Petitioner would keep certain funds in cash out of the receipts of the Bar-B-Que House for her personal use or for deposit in her personal checking account and the remainder of the cash received by the Bar-B-Que House would be sent in a Brink's truck each week for deposit in the business account at the Chicago City Bank and Trust Company. During the calendar year 1963 petitioner made total deposits in her personal checking *275 account at the South East National Bank of $5,636.90. She made deposits during the year 1963 in the two savings accounts in that bank in the amounts of $272.25 and $1,150, respectively. During the year 1963 expenses of the Bar-B-Que House business in the total amount of approximately $2,500 were paid by petitioner either in cash or by checks on her personal bank account. During the year 1963 petitioner made total payments on a 1962 Thunderbird automobile which she had purchased in 1962 in the amount of $1,080. She had personal expenses in connection with the maintenance of the automobile of $549.76. During the year 1963 petitioner moved from the Garfield Street address into a 2-bedroom cooperative apartment and during that year made mortgage payments on the apartment in the amount of $488. She purchased clothing for herself and her daughter during 1963 at a cost of $286.52. She purchased an electric range on the basis of monthly payments of $18 and made total monthly payments on the range during 1963 of $162. During 1963 she paid personal telephone bills of $120, medical expenses of $296.90, life insurance premiums to the Metropolitan Life Insurance Company in the amount of $235.68 *276 and life insurance premiums to Nationa Life Insurance Company of $54. During 1963 petitioner made charitable contributions of $88 and purchased books and magazines for a total amount of $10. In addition to the specific expenses listed above, totaling $3,370.86, petitioner spent approximately $600 for herself and her daughter for food. Petitioner did not receive any money in the form of a loan, gift, or inheritance during the year 1963. There was a fire which closed down petitioner's operation of the Bar-B-Que House for about a week during 1963 and petitioner included certain insurance receipts received in connection with this fire in her receipts from the Bar-B-Que business. During the year 1963 petitioner had a small savings account and kept a safe-deposit box at the First National Bank of 442 Chicago. Sometime prior to October 1, 1965, the First National Bank of Chicago officially notified the Internal Revenue Service that petitioner had made an exchange of United States currency on May 22, 1963, at the bank of $10,000 in small bills for bills of $100 denomination and larger. On the same day petitioner made the exchange of money she entered her safe-deposit box at the First *277 National Bank. On her Federal income tax return for the year 1963 petitioner reported total income of $4,181.09 composed of interest income of $35.81, business income from amusement machines of $468.50, and business income from the operation of the Bar-B-Que House of $3,676.78. A summary of the computation of business income from the Bar-B-Que House is as follows: Gross sales
$63,151.69
Fire insurance proceeds 2,429.00
Total gross receipts
$65,580.69
Cost of goods sold 38,834.50
Gross profit
$26,746.19
Depreciation on automobile (business portion)
500.00
Depreciation on equipment 665.13
Other expenses
21,904.28 23,069.41
Net profit
$3,676.78
Respondent in his notice of deficiency determined that petitioner had unreported income computed as follows: Deposits in savings and checking accounts
$7,059.15
Exchange of currency at First National Bank of Chicago 10,000.00
Total
$17,059.15
Less adjusted gross income per return $4,181.09
Depreciation expense per return 1,165.13
5,346.22
Funds in excess of amount reported and personal
11,712.93
expenses 1,016.62
Total unreported income
$12,729.55
Opinion
*278 The issue here is purely factual. Petitioner's books were in good order, were available, and were offered in evidence. They were well kept for a small business such as petitioner operated and the entries in these books supported the income as reported on petitioner's income tax return and also on the monthly tax returns which she filed with the State of Illinois. Petitioner's Federal income tax return was likewise supported by the monthly figures which had been reported to the State of Illinois. The books were kept by a certified public accountant who not only tesified with respect to the books and his computation of petitioner's State and Federal taxes therefrom but also stated that he kept records for three similar businesses and that the gross profit shown from the sales of petitioner's business was equal to or higher than that of two of the other similar businesses for which he kept books and substantially in excess of the gross profit of one of these businesses. Respondent makes quite an issue over petitioner's not retaining the daily cash register tapes. However, petitioner's explanation that because of the bulk of the accumulation of tapes, she destroyed them after several *279 weeks since she had made entries in the books is entirely reasonable. The purchase invoices were available for 9 months of the year 1963 and the explanation of the loss of the other 3 months' invoices for the year 1963 was a reasonable one. Respondent offered evidence of the pounds of various meats purchased as shown on the invoices for the 9 months for which they were available and also offered evidence of petitioner's sales prices. He makes no argument from this evidence on his brief. It appears that the quantities of various meats purchased as 443 shown on the invoices when sold at the sales prices shown by the record in no way reflect adversely on the accuracy of petitioner's income as reported. Therefore, there is nothing to cast suspicion on the testimony of petitioner that all receipts and expenses of the operation of the Bar-B-Que House were properly entered on her books for the year 1963 other than petitioner's exchange of the $10,000 in small bills for $10,000 in larger bills in May 1963. We recognize, of course, that a meticulously accurate set of books is not sufficient to overcome a determination made by respondent where the other evidence gives a clear indication *280 that the taxpayer had income in excess of the amount reported on his books. We have therefore examined the other evidence in the instant case to see if it supports or casts doubt upon the accuracy of petitioner's income as reflected from her books. If we accept petitioner's statement that the $10,000 in small bills exchanged on May 22, 1963, at the First National Bank of Chicago for bills of larger denominations was not her own money, all the remaining evidence supports petitioner's contention that her books and records accurately reflect her income for the year 1963. Respondent argues that petitioner's deposits in her bank account and the total amount of her living expenses belie the small amount of income she reported for Federal income tax purposes. However, the record indicates an exactly opposite conclusion. Petitioner's total living expenses for 1963 as determined by respondent and as supported by evidence at the trial other than any cost which she might have incurred when she lived at her place of business on Garfield Street were $3,970. Petitioner reported taxable income of $4,181.09 and deducted business depreciation, which, of course, would not be an amount paid out in *281 cash of $1,165.13. The total of these two amounts is $5,346.22. Petitioner's total living expenses as shown by respondent of $3,970 when added to her deposits in savings accounts of $1,422.25 results in a total of $5,392.25, an amount remarkably close to petitioner's available cash from her business. Similarly, the evidence of available cash as compared to total deposits in petitioner's checking and savings accounts gives no indication of funds aside from those of her business operation. In addition to the $1,422.25 which petitioner deposited in savings accounts in the year 1963, she deposited $5,636.90 in her checking account. However, the record shows that during the year 1963, petitioner paid approximately $2,500 of expenses of the Bar-B-Que House by cash or checks drawn on her personal checking account. When this $2,500 is added to petitioner's available cash fund the resultant total of $7,846.22 is $787.07 in excess of petitioner's total deposits in her savings and checking accounts. Respondent argues that petitioner must have paid approximately $125 a month rental for her living quarters at the same address as the Bar-B-Que House but the record is totally barren of any evidence *282 to support this contention and since no such item is included as a personal expense of petitioner in respondent's deficiency notice, nor was any evidence introduced to support such a contention, we think that the preponderance of the evidence supports petitioner's contention that her total personal living expenses were not over $3,970 in 1963. This conclusion carries with it the inference that petitioner did not reimburse the business for the portion of the quarters which she occupied. Respondent has not raised any issues that her income should be increased by any amount which would be allocable to any personal living quarters she had at the business address of the Bar-B-Que House, either in the notice of deficiency or at the trial. Respondent's principal argument is that petitioner's explanation of the exchange of the $10,000 cash is patently unbelievable. Petitioner testified that on the morning of May 22, 1963, she was on her way to the First National Bank of Chicago to place an insurance policy in her safe-deposit box, that just before she entered the bank a man whom she had seen at a bowling alley when she went there about once a week to bowl and whose name she believed to be *283 Jimmy Jordan, came up and spoke to her. This man asked her if she were going to the bank. She told him that she was and he asked her if she had an account in that bank. She replied that she did have a small savings account in the bank. The man then told petitioner that he had gone into the bank to try to get some money changed and the teller had refused to change it because he did not have an account at the bank and asked her if she would get the teller to change the money for him. Petitioner stated that she saw no reason not to accommodate an acquaintance so she walked with him to the teller's window and asked the teller if he would change some money for her. The teller asked if she had an account at the bank and she stated that she did. The teller checked her account and 444 then said he would make the exchange. Petitioner stated that at this juncture the man she knew by the name of Jimmy Jordan brought the money out from underneath his coat wrapped in something which she did not particularly notice, placed it in the teller's window, and that she did not even notice the amount that the teller counted out when he made the exchange. After the teller passed the money out, Jimmy *284 Jordan took the bills, put them back in someplace underneath his coat, and thanked her. They chatted a few minutes and then he left. Petitioner stated that she then went on to her safe-deposit box, placed the insurance policy in the box, and left the bank. Petitioner stated that she gave no further thought to the matter until sometime after the first of October 1965 when an investigation of her Federal income tax return for the year 1963 was commenced and an agent of the Internal Revenue Service asked her to explain the exchange of $10,000. Petitioner said that she then and has since attempted, through talking to other people whom she knew who bowled at the bowling alley where she and Jimmy Jordan had bowled, to locate Jimmy Jordan but has been unable to locate him, and in fact has been told by one person who bowled at the alley that he thought Jimmy Jordan was dead. Petitioner stated that she had seen Jimmy Jordan after May 22, 1963, when the money was exchanged but that sometime prior to October 1, 1965, the bowling alley where she and Jimmy Jordan had bowled had been closed and she had not seen him at the other bowling alley where she and some other individuals who had bowled *285 at the alley which was closed went to bowl. Respondent introduced evidence that his agents had attempted to locate Jimmy Jordan by checking through various city directories for persons bearing the name, "James Jordan" or "Jimmy Jordan" but had been unable to locate any person who admitted to being the Jimmy Jordan who had asked petitioner to procure the exchange of funds at the First National Bank of Chicago. As unlikely as petitioner's explanation might sound under different circumstances, it is to be noted here that certain facts do tend to support it. One fact that tends to support petitioner's explanation is that she only visited her safe-deposit box once on May 22, so that she could not have removed the small bills and returned the larger bills to the box. The fact that petitioner had both savings and checking accounts personally and kept a business checking account tends to support the fact that she deposited her cash in bank accounts. Also, the fact that petitioner's sales by months remained relatively stable for 1963 for the period prior to May 22, 1963, and the period subsequent thereto tends to disprove the probability of petitioner's having withheld such a sum as $10,000 *286 out of her Bar-B-Que House receipts during the first 4 i/2 months of 1963. There has been no other probable source of income for petitioner shown, and petitioner testified that except for incidental items which were reported on her return, the Bar-B-Que House was her sole source of income. Respondent has offered no evidence to even suggest another source. Furthermore, a certified public accountant had been keeping petitioner's books since petitioner opened the Bar-B-Que House in 1959. This certified public accountant impressed us as an honest and upright individual. He testified that based upon all of the information which he had available to him petitioner's books and records fairly represented her income for the year 1963. This accountant had kept petitioner's books since 1959 through the time of the trial of this case. Certainly, if there had been any drastic unexplained change in the sales and expenses of petitioner's business in the first 4 months of 1963 as compared to those items in prior and subsequent years, this accountant would not have given testimony that based on all the information he had available in his opinion petitioner's books for the year 1963 fairly reflected *287 her income from the Bar-B-Que House. Based on the evidence in this case it is "patently unbelievable" that petitioner withheld $10,000 of receipts of the Bar-B-Que House and did not enter the $10,000 in her receipts record during 4 months and 22 days of 1963. But to sustain respondent's determination we would in effect be drawing such a conclusion. Considering all of the evidence in this record, we conclude that the preponderance of the evidence supports petitioner's position that her income for the year 1963 was properly reported. Decision will be entered for petitioner. 445